May it please the Court, Counsel. I am Ray Barker. I represent Emily Sharon Gladhart in this case. Mr. Smith, Gerald Smith represents William David Gladhart. The two cases are so interrelated that my argument, I intended to apply to both cases. I intend to take approximately 15 minutes and leave approximately 5 minutes for Mr. Smith to then present a rebuttal. In their appeal, Mr. and Mrs. Gladhart have raised three issues. They have raised the issue of the trial court's denial of their motion for judgment of acquittal on the basis of insufficient evidence. Even considering the evidence in the light most favorable to the government, the evidence presented at trial was not sufficient for a rational trier of fact to have found Mr. and Mrs. Gladhart guilty beyond a reasonable doubt. Most of the evidence presented by the government was submitted in an unfounded attempt to prove that Mr. and Mrs. Gladhart had deceived the bank by failing to disclose to the bank that they had given Bill Stoddard a lien or a security interest in their personal residence. The government failed in its attempt because no such security interest existed at the time the Gladharts' loan was renewed. I remember the district judge threw out that liability theory that the jury could consider it. As I understand the case from the correct view, I'm wrong. The only two issues that went to the jury on this were, one, the transfer of the Arizona property to the Sun, and two, the failure to record rents. Unpaid rents is a liability on the balance sheet, which distorted the balance picture. But as far as the deed to the door business on Stoddard in the house, the judge threw that out so the jury can't consider that, correct? Eventually he did, yes. So that's not before us? That's correct. Much of the trial was used up with evidence on that issue, but that was not before the jury. Let me also clarify a practical consequence. If it were to be determined that there was insufficient evidence on either of those issues because of the nature of the verdict form, what would be the result for your clients? If it was found that there was insufficient evidence as to either of those. Let's just say one of them. Let's say there's insufficient evidence as to the packed rent problem. I think then we cannot conclude that there was unanimity within the jury as to what their finding was, which is our argument on the special verdict issue. Well, they were instructed that they had to be unanimous on each statement if they were going to compare. Yes, I realize the judge did give that instruction. However, if the special verdict had been used, then we would know for sure that there was unanimity. This way, we just have to guess that they found either the Arizona property issue or the ramp issue, or they went outside of that and found something to do with the undisclosed mortgage, contrary to the instructions. Of course, the problem with that theory, which is certainly possible, but the law doesn't help you out too much on that. That's correct. I love instructions. Can I get down to some specificity so that I can zero in on this? As I understand it on the rent issue, the only issue here is the balance sheet. The financial statement shows somewhere around $93,000 was the starter. Yes. But allegedly, and I'll let you fill in the blanks, did not show unpaid rent, whatever that may have been that was being carried on the books, maybe as accounts payable or whatever. As I understand the case of the government of their argument, nowhere could the bank find that, apparently. At least, that's their position. Secondly, on the Arizona property, the Arizona property is listed on the financial statements as an asset that could be realized in the event there's a default. When, in fact, it was transferred to Sun, it was not taken off of the financials, but the claim of your client is we told the banker orally that it was gone. The banker said, I don't remember that, and I always mark changes on it when they give me the financials. I didn't mark it, so I don't remember that. Is that basically the case? That's basically the case. The Arizona property did belong to Mr. and Mrs. Gladhart when the loan was originally made. It was interim between the renewal. Between then and the renewal, they had deeded it to their son for purposes explained. So then it's a question of veracity of witnesses from the fact, because it's on the statement. You pull the statement, it's there. They say, but we told them that we didn't have it anymore, so it's a question of the veracity between the bank loan officer and your clients. Right. It's a balancing of the testimony of Mr. Gladhart, Mrs. Gladhart, and the son, Michael, all stating that they told Mr. Koontz that that property had been transferred against his testimony, that he didn't even remember having a meeting with them. He never testified that they didn't tell him. All he said was he thought he found out about it sometime that fall from somebody who he couldn't even identify who told him. But that's, again, it's a veracity. That's correct. My argument is that that testimony from him is insufficient to overcome the sworn testimony of the three people who testified. The rents is another little problem for me. Is there anything in the record which would show that the amount of the back-due rents, accounts of payable entry or whatever, are there for the bank to see other than the fact, as I understand the record, that your client testified, Mrs. Gladhart. He says, well, it wasn't paid. It would go into accounts and the accountant took care of that or something like that. Where does it show up in the record, if anywhere? How do we look at that relative to what the jury saw? I don't believe there is or there was a running record of that. Mr. Stoddard, when it came time for the preparation of the deed of trust in January of 2001, submitted the ledger statement that's in evidence that shows the, on the top part of it, shows the amount of the loans. On the bottom, it shows the accrued rent. Mrs. Gladhart testified that she was surprised by the amount of the accrued rent. There was also testimony that Mr. Stoddard had never sent them a bill. He had never mentioned it to them. Testimony that the accountant had never asked them about it. They knew there was a rental arrearage. What Mrs. Gladhart did each month was she gave the accountant their checkbook ledger, their receipts, business receipts, money in, and she gave them, gave him a summary of the accounts payable, which included the rent, but it didn't specify that as rent. It said, gave him total accounts payable. She assumed he put that in the statements. Gotcha. So now, again, we're back to facts before a jury, who they're going to believe then, the financial records that were put in that don't show it, or their testimony that they've gone into the accounts payable and they gave them to the accountant and said, correct? Yes, and again, our argument is that the evidence was insufficient because there was no evidence that they had any knowledge. There was only circumstantial evidence that they should have known, and I'll be the first to admit that they probably should have known that there was something missing when they weren't paying their rent on a regular basis. But I'm having some trouble because I thought their rent was lumped into the accounts payable, given to the accountant, correct? Yes, it was. But the amount that showed up on the statement was something like $12,000, if I recall, and their rent was $11.50 a month. So it wasn't adequate to take care of it, but they didn't pay that much attention to their records. Maybe I'm missing something. If it's lumped in the accounts payable, that's reflected on the financial statements, and if the bank gets that financial statement with a lump sum account payable, but not broken down into rent, then the bank did see the total liability. Is that what your argument is? Not really, because the amount that the bank saw on the financial statement as accounts payable was not reflective of the real amounts payable. In other words, there were $29,000. It didn't go from the accountant back onto the financial statement. That's right. The communications between the Gladhors and their accountant were insufficient in some manner. That's what I thought. No matter how you cut it, the amount of the rents didn't appear on the financial statement. That's absolutely correct. If it had, the bank couldn't complain. Right. And our argument is, of course, that the Gladhors had no knowledge that it didn't appear because they gave this financial information to the accountant every month, and it simply wasn't reflected. If I may, I'd like to direct my attention to the issue of the motion for a new trial on the basis of prosecutorial misconduct. In my brief, I have outlined several of the instances of false and misleading testimony that was given to the grand jury. I would like to just, if I could, mention a couple of those. One that I think is quite important is that the… Could you explain, let's say there is prosecutorial misconduct, but then your case goes to trial and you have the conviction. How do you square that with the Supreme Court cases that, in effect, say it's kind of water under the bridge? Well, I think my interpretation or my reading of those cases deal with the decision of whether or not to prosecute, whether there is overcharging, duplicate charges, and that is what we have here. We have a situation where there would not have been an indictment, but for the prosecutor persisting in this theory that somehow there was a lien against the personal residence. The indictment specifically says that's what they're charged with, and then it says, and other information or something to that effect, kind of a catch-all phrase. We got caught up in the catch-all phrase. But if the prosecutor stated this just mistakenly, that's not misconduct. And my understanding of the law is, as Judge McKeown says, that if, in fact, the jury finds them guilty, that's the end of any concerns about the indictment. Well, I would submit that it is misconduct when the jury in the first session specifically asks, is there a document that we can look at that proves when this loan was created? The prosecutor says, I will see if I can find such a thing. The grand jury reconvenes, and she withholds that document from them. That being the deed of trust of January 31, 2001, which would show on its face it came some five months after the initial loan and renewal dispute. If there are no other questions, I'd like to reserve the remaining time for Ms. Schmidt. Thank you. Good morning, Your Honors. I'm a little nervous. My name is Nancy Cook. I am both the attorney who handled this case from inception and to appeal. I will try to respond to the issues as they were brought up, and then I would like to add some other comments, if I could, please, if that's fine with the Court. First of all, counsel stated that there was some record available to the accountant that should have told him that the past due rents were not being reflected. And that's not the testimony of the accountant, not the testimony of Mrs. Gladhard, either. Their testimony was there were no records available to him at any time that would indicate past due rents. In his opinion, Mrs. Gladhard was sophisticated enough to know that that was a count payable that should have been reflected. Mrs. Gladhard, when she testified, stated that he should have known because the checks were different from month to month that went to Hidden Valley, which was Mr. Stoddard, who they were leasing the building and paying rent to. Upon further cross-examination, Mrs. Gladhard stated that there was no way that he could have known with any specificity what the rental agreements were between Hidden Village and the Gladhards. He had no knowledge of any conversations between the parties who had the contract. She admitted that she had no direct conversations with Mr. Roberts, the CPA, regarding any past due rents. So he had no way of reflecting it in his documentation, which was submitted to the bank. Counsel stated, and that is reflected on Government's Exhibit 25, is the ledger that was kept by Hidden Village, reflecting both, as Mr. Stoddard did, he reflected differently to loans or loans made and payments reflected, and the back rent, which started back in 1992 and by the year 2000 was $37,950. Which leads to another point I believe the Court has asked about regarding their cash flow and the significance of this and why this is a material false statement. Christie Manufacturing was not an extremely profitable company, so any admission regarding accounts payable very much affected their balance sheet and whether or not they had sufficient cash flow to repay their loan. And this was testified to by both Mr. Koontz, the gentleman who was the loan officer, and Mr. Vagey, who went back and reviewed the books and records for the Christie Manufacturing loan to determine whether or not he could determine, by looking at the records, whether there was any reflection of the claims that the defendants made regarding that they had told the bank about the Arizona property and that everyone should have known about the past due rents, but were not sure how that could have been possible. Counsel stated there was nothing other than testimony regarding these particular false statements. The government respectfully disagrees and states that there was testimony from the bank officials, the accountant, and the books and records of the bank itself where these false statements were housed. And something that came up during the briefing but did not come up during argument was the fact that it was personal and corporate liability because this is such a closely held corporation. I don't know if the court wants me to go into that. They just signed a personal guarantee, which is very customary in these situations. Where it's a closely held corporation. All right. Regarding prosecutorial misconduct, first of all, the United States does not believe any prosecutorial misconduct was committed. Also agrees with the court's statement that the pettit jury's subsequent verdict, if in fact there was some misconduct, basically alleviates that or annihilates that. There were two allegations of misconduct which the defense brought up. One was a discussion of a lien and another was the asking of Elizabeth Pendon's questions. First of all, the grand jury was never misled at no point did the prosecutor impugn upon their ability to distinguish the facts and did not influence them in the determination as to whether or not there was probable cause to believe offenses had been committed. The court has the grand jury transcript, but what I would like to do is go back into the various issues. First, let me answer the one about Liz Pendon's. It was one question asked during the November grand jury session. The question was three lines. I believe the response was four lines. This is out of about 750 lines of grand jury testament. And the question basically was, was it Liz Pendon's file? And the response was, no, there's no record of any Liz Pendon's file. This in no way influenced the grand jury improperly, nor was it an improper question. The second one deals with the fact whether or not the government continued to state that there was a lien filed by anyone prior to the renewal of the loan. That is not what was stated to the grand jury by the witness. And what was stated by the witness in the grand jury was exactly what the testimony was, and that was that Mr. Gladhart went to Mr. Stoddard and gave him the deed to the property. Mr. Stoddard put it in his desk and never filed it until after the renewal of the loan in 2001, which was clearly stated in the grand jury testimony in December. The witness testified that it was just filed six to eight months ago during the testimony, which was in December of 2001. That raises an interesting question being brought up. It doesn't seem to be, in my opinion, in the briefs, any explanation, anything, with regard to the relationship between Stoddard and the appellants here, and yet there's a lot of money owed. Yes, Stoddard kind of puts the things in the drawer. Is there anything in the record that shows that this was done intentionally to deceive the bank and that they asked him to stick it in the drawer? I mean, I think it's an interesting fact, but so what? I mean, does it mean something to this case? It meant something to the government because I believe that issue should have gone to the jury. But Mr. Stoddard, is there a relationship? Is he an uncle or something? No, not to my knowledge. My understanding is Mr. Stoddard has done business with the Gladhart family since the 1970s. His father did business with them, in my estimation. But the appellants gave the deed of trust and good faith at a time when it would have become a lien, and if Stoddard didn't file it, so what? I mean, unless the fact that you're saying that there's something sinister about the fact that the lien wasn't there, they were kind of hiding it or covering it up, what's the significance of it? Maybe I'm missing something. I believe the significance of that is at all times the Gladharts knew that the deed was given to Stoddard, and as Mr. Stoddard put it, they told me it was for security. And at no time was that property truly available to the bank. Okay. That's my view on that. I understand. It's a positive act of the appellants, a good faith giving a deed and putting a lien on the property. And Mr. Gladhart did testify. A question was posed by the government. Why is it that you didn't give the deed to your property to the bank? It's because I didn't love the bank, I believe was his direct response. But there is no question that the grand jury was correctly told that the lien was not filed until after the Gladharts had applied for the loan. There was no prosecutorial misconduct, no misleading of the grand jury. There was another issue raised by the defense that the government failed to read the full bankruptcy testimony. Instead, that grand jury just read one question, which was, to Mrs. Gladhart, did you tell the bank that the Arizona property had been transferred in November of 1999 when you reapplied for the loan in August of 2000? Her answer was no. Her husband interjects at that point and says, oh, no, we told them. It was the government's choice not to read that information. But, once again, it was read to the pedigree. They were given the entire transcript or, excuse me, that part of the transcript, which was requested by the defense, was read to them. They had all that information to consider at that time. There is no indication that that is exculpatory evidence, and there is no misconduct. I'm not sure which other issues the courts would like me to address because there are several. Is there any order in which you would like me to address them? No, there don't appear to be any questions on other issues. Well, then, thank you very much. Before you leave, this has nothing to do with the case, but it's of interest to me because I'm the chairman of the Space and Security Committee. Did you try this in the Coeur d'Alene courthouse? I did. And so you are trying cases up there? Yes, we are. And I noticed that your address is at the Coeur d'Alene. It is of continual interest to the court from an administrative matter because it is a satellite courthouse, and I know that the judges have problems getting up there. I was interested that this was Coeur d'Alene located, and you are trying cases up there. Actually, this case wasn't tried in Coeur d'Alene. It was tried in the Moscow courthouse. Now that I think back, yes, Your Honor. Okay. Cases are tried in both courtrooms. Good to know. Thank you. Thank you very much for your time. Mr. Smith? Thank you, Your Honors. This is my police court counsel. I'm Gerald Smith. I represented Logan David Flatheart. As indicated by Mr. Parker, we determined to split the argument up in this way because it's been my experience that when we try to split issues, the court sometimes has different ideas of what's important, and we wind up with disjointed arguments. This really does work much better for everybody. Your Honor, if I may just focus on a couple of issues here, and one is the problem in the grand jury and the effect that that had. And the court has pointed out, well, isn't the case law? Doesn't that lead us to the conclusion that a verdict by the trial jury cures any problems with the grand jury? And under most circumstances, that can be true. But I believe that the entire procedure in this case, from the grand jury to the pretrial procedure to the trial itself, all combined to deprive the Gladhards of a fair trial and makes the verdict unreliable. We had an indictment that said that the Gladhards had failed in their personal debts. There was no personal debt to Stoddard. That was all business debts. We had testimony in the grand jury from the agent that said that in addressing the personal financial statements, and he went on to say, and this is quoted on page 30 of Mr. Gladhards' brief, that there were a number of issues in the corporate financial statements. That's where the backgrounds could have shown up that I was not aware of previously and that aren't really material to what we are doing. If you look at the grand jury testimony and what was presented there, if you look at what happened during the pretrial proceedings and the motion for a bill of particulars and the response, it is obvious that what the government was focusing in on was this non-existent lien on the property, the home of the Gladhards. My question is, analytically, how would that differ from a situation in which you had a count, which was a murder trial, an extremely serious count where you have a couple join and one falls out because of lack of proof or whatever, but you've had basically a whole trial and the jury is told, of course, forget all that. Wash it out of your mind. How would that differ, and in that case, that's okay. How would this differ analytically with where it leaves the jury? Most of the time when you have a problem with separate counts, that the proof isn't sufficient for one or for some reason it drops out during the course of trial, there's not that great of an effect on what remains. Here we only had one count. We weren't sure throughout the course of the proceedings and even during trial precisely how the Gladhards were supposed to have committed an act that made them guilty of that count, but there was only one count. If it had not been for the accusation that there was some cover-up of a non-existent lien, much of the trial testimony would have been objectionable, and we pointed that out in our motion for a new trial or judgment of acquittal, and the district court simply said, well, there was no objection to it, but the problem is we couldn't object to it. We had to answer the question about this accusation that there was cover-up of a lien, of a deed of trust that was not even created until months after the loan was renewed. We had to answer that. That was an accusation. It was an accusation in the indictment. It was an accusation in the bill of particulars, and it was the only accusation in the government's trial brief, which was its last pretrial statement. That's what we had to answer. In order to answer that, we had to allow evidence as to when that deed of trust was actually created. It was created months after the renewal. It was nonexistent at the time of the renewal. It could not have been covered up. We had to allow that evidence in, and in allowing that evidence in when it was created, we also had to allow evidence in as to what was going on at the time. It was created because at the time the deed of trust was created, several months after the loan was renewed, the decision had finally been made by the Gladhards, this business isn't working, we need to shut it down. And they did execute a deed of trust in favor of Bill Stoddard at that time. The bank could have. There was nothing, despite the government's repeated statements, there was nothing that would have prevented the bank from getting a lien on that residence either in 1999 when the loan was first issued or in August of 2000 when the loan was renewed. If the bank had said, we want a lien on your house to secure your personal signature, there was nothing that would have prevented them from doing that. Well, they could have asked for it, but it couldn't have been given in good conscience, is that right? It could have been given in good conscience, it could have been given legally, it could have been given morally. Bill Stoddard had nothing except the warranty deed in the name of the Gladhards that has no legal effect at all. If I give you a deed to my house in my name, that doesn't encumber my house. I understand the real property law quite well, but as a moral matter, they just gave him the deed for nothing? They gave him the deed. The testimony was that they owed him money. Do you want the house for security? He did nothing. He did nothing to actually get the house as security. Was it a moral matter? I don't know. But it's not a legal matter. And the court did ask, what's the effect of that dropping out? The effect was we had a rather lengthy, complicated trial that dealt in large part with that issue. There were only two issues left for the trial, for the jury at the end of the trial, the back rent and the Arizona property. Which one did they agree on? We don't know because we were denied the special verdict. What's the effect if the evidence is insufficient on either one of those? The verdict has to be vacated because we don't know which one the jury found. And if they found on the one that there's insufficient evidence on, if there's only one, it's our position that there's insufficient evidence on either. But if they found guilt based on one and the evidence isn't sufficient to support that one, then the verdict must be vacated. Thank you. The time went awfully fast, but I think the briefs covered the other areas. Thank you. They do. Thank you very much. Thank you all for your arguments. The case of the United States versus Vladimir is submitted and adjourned.
judges: B Fletcher, Brunetti, McKeown